# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
_____

Oralia Luna, o/b/o A.L.                      Civ. No. 11-1137 (PAM/JJK)

       Plaintiff,

v.

                        **REPORT AND**
Michael J. Astrue, Commissioner    **RECOMMENDATION**
of Social Security,

       Defendant.
_____

Daniel S. Rethmeier, Esq., Rethmeier Law Office, counsel for Plaintiff.

David W. Fuller, Assistant United States Attorney, counsel for Defendant.
_____

JEFFERY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Oralia Luna seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for supplemental security income benefits on behalf of her child, A.L.. The parties have filed cross-motions for summary judgment. (Doc. Nos. 19, 25.) This matter has been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied and that Defendant's motion be granted.

**BACKGROUND**

**I.    Procedural History**

Plaintiff filed an application for supplemental security income benefits on behalf of her son, A.L., on February 22, 2006.  Plaintiff alleged that A.L. had a disability since October 1, 2004 based on attention deficit/hyperactive disorder (ADHD), post-traumatic stress disorder (PTSD), depression, anxiety, and sleep issues.  (Tr. 86–88, 117.)[1] The Social Security Administration denied Plaintiff's application both initially and on reconsideration.

Subsequently, Plaintiff requested a hearing with an administrative law judge ("ALJ").  Represented by counsel, Plaintiff and A.L. testified at a hearing before an ALJ in St. Cloud, Minnesota, on December 4, 2008.  (Tr. 31–51.)  On February 4, 2009, the ALJ issued a Decision finding that A.L. was not disabled and denying supplemental security income.  (Tr. 14–30.)  Plaintiff then requested review from the Appeals Council, which the Appeals Council denied.  (Tr. 1–6.)  Plaintiff now seeks judicial review of the ALJ's decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  Plaintiff and Defendant have filed cross-motions for summary judgment. (Doc. No. 19, 25.)

**II.    Factual Background**

Born on January 24, 1997, A.L. was seven years old at the time of the alleged onset of his disability, October 1, 2004.  (Tr. 299–300.)  Plaintiff applied

---

[1]    Throughout this Report and Recommendation, this Court uses the abbreviation "Tr." to refer to the administrative transcript in this case, Civ. No. 11-1137 (PAM/JJK).

2

for supplemental security income on behalf of A.L. at the recommendation of one of A.L.'s teachers on February 22, 2006.  (Tr. 17, 41.)

### A.    The Record Prior to the ALJ's Decision

A.L. underwent two examinations by Steven Thurber, Ph.D., at Woodland Centers in October 2004 to investigate his disability.  (Tr. 299.)  A.L. would not answer Dr. Thurber's questions, did not comply with requests, and explored the office, so Dr. Thurber ended the interview after ten minutes.  (*Id.*)  Dr. Thurber noted reports from A.L.'s teachers that A.L. had attention problems, including difficulty finishing tasks, concentrating, and sitting still, as well as poor performance in school, especially in English language based subjects.  (Tr. 299–300.) Spanish is A.L.'s first language and is the primary language spoken in his home; he is also fluent in English.  (Tr. 299.)  Prior testing in school indicated that A.L. functioned at an average general intellectual level.  (*Id.*)  Dr. Thurber made note of A.L.'s history of hyperactivity and inattentiveness, as well as some aggressive behavior, especially in the home.  (*Id.*)  A.L.'s father expressed concern over signs of anxiety and depression, including crying, fearfulness, excessive worrying, and suicidal expressions.  (*Id.*)  Dr. Thurber diagnosed A.L. with ADHD and oppositional defiant disorder and recommended consideration of medication, discussions with A.L.'s parents about disciplinary techniques, school consultation, and evaluation of the possibility of childhood depression.  (Tr. 300.)

Based on Dr. Thurber's referral for psychiatric medication, Dorothy Anderson, M.D., also of Woodland Centers, evaluated A.L in January 2005.

3

(Tr. 301–03.)  Dr. Anderson noted that A.L. had attention problems in school and at home, as well as symptoms of anxiety or depression manifested by sleep disturbance, separation anxiety, and frequent bed-wetting.  (Tr. 302.)  Dr. Anderson prescribed Adderall, noting A.L.'s mother's interest in trying medication but his father's reluctance.  (Tr. 303.)  Dr. Anderson later saw A.L.'s mother in the hall at Woodland Centers and she told Dr. Anderson that A.L. was not functioning any better with Adderall.  (*Id.*)  Although Dr. Anderson recommended a follow-up appointment to evaluate the medication's effectiveness, A.L. and his family did not attend the appointment.  (*Id.*)

Dr. Anderson met with A.L. and his mother again on January 26, 2006. (Tr. 324.)  They had, by this time, attempted trials of Depakote and Methylin, but A.L.'s mother reported no improvement in A.L.'s mood on these medications, although he was taking the Depakote irregularly.  (*Id.*)  His mother also chose to discontinue the use of Methylin by this point because she felt it made A.L. more irritable.  (*Id.*)  Dr. Anderson noted his mother made these observations at home after school, however, and his teachers may have seen benefits from the medication during the school day.  (*Id.*)  Dr. Anderson prescribed Adderall and Depakote, noting she would like to educate A.L. about swallowing pills because it would be easier to administer medications if he could swallow a once-daily pill instead of the current medication, which he had to take several times per day. (*Id.*)

In an appointment on March 8, 2006, Dr. Anderson stated it was difficult for her to gauge whether the medication trials they had attempted were helping A.L. because she had little contact with A.L. (Tr. 322.) Dr. Anderson attempted several medications with A.L., including Methylin, Depakote, and Adderall, which were administered at school and at home. (*Id.*) School officials reportedly saw improvement in A.L.'s behavior when he was given Methylin. (*Id.*) A.L.'s parents told Dr. Anderson he was too emotional when on the Methylin and stopped administering it at home, and then stopped A.L.'s school from administering it as well. (*Id.*) A.L.'s teachers commented that his behavior was worse once he was off the medication, though, marked by one incident in which A.L. brought a toy gun to school and pretended to shoot his classmates. (*Id.*) After the March 8 appointment, Dr. Anderson continued A.L.'s use of Methylin and discontinued the prescription for Depakote. (*Id.*) A.L. was set to begin Youth Day Treatment at Woodland Centers on March 13, 2006, although the record includes no notes of his attendance. (Tr. 322.)

In April 2006, Heather Carruthers, A.L.'s third grade classroom teacher, submitted a questionnaire about A.L.'s condition to the Social Security Administration. (Tr. 142–49.) She reported that A.L. was performing at a low average third grade math level and late first grade reading and writing levels. (Tr. 142.) The questionnaire inquired about A.L.'s performance in each of six domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and

caring for himself.  (Tr. 142–47.)  Carruthers acknowledged A.L. had no problems caring for himself or manipulating objects.  (Tr. 146–47.)  She reported he did have problems with acquiring and using information, especially in "reading and comprehending written material" and "expressing ideas in written form;" for both, she gave A.L. scores indicating "a serious problem."  (Tr. 143.)  She did not give him a score of "very serious problem" for his performance in any activities. She opined that A.L. had difficulty reading, which made comprehension, especially of written directions, particularly hard for him.  (*Id.*)

She also evaluated his performance in attending and completing tasks. She reported he had a "very serious problem" working without distracting himself or others and a "serious problem" focusing on completing tasks or activities. (Tr. 144.)  She also reported "slight" problems or "obvious" problems with other activities that fell within this domain.  (*Id.*)  In considering A.L.'s abilities in the domain of interacting and relating with others, Carruthers did not find A.L. to have any "serious" or "very serious" problems.  (Tr. 145.)  She reported that A.L. was "not independent when given a task" and required the assistance of an adult because he was not confident that he could complete tasks himself.  (*Id.*) Carruthers also made note of A.L.'s use of medication and found that it "has really helped" him.  (Tr. 148.)

Patrick J. Carroll, M.A., conducted an examination of A.L. on referral from Social Security Disability Determination Services on August 2, 2006. (Tr. 333–38.)  Dr. Carroll noted past reports of A.L.'s difficulty paying attention as well as

6

trouble maintaining friendships, but that recent medication had resulted in all-around improvement in A.L.'s behavior.  (Tr. 333–34.)  Dr. Carroll completed a test of A.L.'s intellectual skills and found that he struggled more from his poor verbal skills than due to any difficulties paying attention.  (Tr. 335.)  During testing, A.L. did not leave his chair or exhibit other behavior that would demonstrate a lack of focus.  (*Id.*)  A.L. gave up or did not make an effort on some tasks during the test, but put good effort toward completing others.  (*Id.*)  A.L. reportedly enjoyed being successful, and Dr. Carroll noted he did not have any trouble understanding directions during testing.  (*Id.*)  In assessing A.L.'s daily routine, Dr. Carroll noted A.L. "doesn't do too well" until he has taken his medication in the morning and by the time it wears off in the evening, he has more trouble with attention.  (Tr. 336.)  Dr. Carroll believed A.L. was relatively independent for his age based on his ability to do some tasks, like dressing and getting food, on his own.  (Tr. 337.)  Dr. Carroll also noted that A.L.'s moods change frequently.  (*Id.*)  Following testing, Dr. Carroll assigned A.L. a Global Assessment of Functioning (GAF) score of 60.[2]  A GAF score between 51–60 indicates moderate symptoms or functional social, occupational, or school difficulties.[3]  He also found A.L. had an intelligence quotient (IQ) of 71.  (Tr. 335.)

---

[2]     A GAF score indicates a mental health clinician's judgment of the overall level of psychological, social, and occupational functioning of an individual. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Health Disorders* 34 (4th ed. 2000).

[3]     *Id.*

Later in that same month, August 2006, state agency reviewing doctor Margaret Getman, Ph.D., L.P., evaluated A.L. for a disability determination (Tr. 357–63.)  With the options "No Limitation," "Less Than Marked," "Marked," or "Extreme" to rate A.L.'s functioning in six domains, Dr. Getman rated A.L. with "Less Than Marked" limitations in five domains (acquiring and using information, attending and completing tasks, interacting and relating with others, caring for yourself, and health and physical well-being) and "No Limitation" in moving about and manipulating objects.  (Tr. 359–60.)  With regard to A.L.'s ability to acquire and use information, Dr. Getman noted A.L.'s need for additional reading assistance in school.  (Tr. 359.)  She also did not observe any problems with A.L.'s focus and acknowledged his improvement in attending and completing tasks with medication.  (*Id.*)  In considering his ability to interact and relate with others, Dr. Getman made note of A.L.'s friendships, but also his difficulty in respecting authority and following rules.  (*Id.*)  As to his ability to care for himself, she explained A.L.'s impulsive behaviors and poor judgment, including an occasion when he brought a toy gun to school.  (Tr. 360.)  Finally, with regard to his health and well-being, Dr. Getman made note of A.L.'s need for ADHD medication.  *Id.*  Dr. Getman explained that, in considering all of these domains, while A.L. exhibits "severe mental impairment," his limitations did not meet the requisite disability listings.  (Tr. 363.)

In September 2006, several of A.L.'s extended family members submitted remarks about A.L.'s behavior and condition to the SSA.  (Tr. 150–52.)  Each

noted A.L. was a very active child who did not always do as he was told. (Tr. 150–52.) One aunt mentioned that she could not take care of him because she could not "keep up with him." (Tr. 150.) Another relative explained that A.L. always got into trouble and could not be taken to stores because he would "grab[] everything in sight" and threw tantrums. (Tr. 151.)

In January 2007, A.L. attended a follow up appointment with Dr. Dorothy Anderson. (Tr. 394.) Dr. Anderson had, by this point, prescribed a number of medications for A.L. and there had been various logistical problems with them, including a patch that caused a red, itchy spot and A.L.'s dislike of a sour, chewable Methylin pill. (*Id.*) A.L. demonstrated several emotional problems, including bursting into tears or laughter "for no apparent reason," being quick to anger, a recent preoccupation with germs manifested in taking up to four baths a day, and wanting to spend time alone. (*Id.*) A.L. reportedly stopped wetting the bed by this point. (*Id.*) Dr. Anderson observed A.L. was focused and "rarely smile[d]" during their appointment, often saying he did not know answers and she believed that he actually did not know. (*Id.*) Dr. Anderson also made note of mixed evaluations from A.L.'s teachers, some saying he was doing well and others saying he needed to improve his listening skills. (*Id.*) At this appointment, Dr. Anderson increased A.L.'s Methylin dosage and suggested adding a mood stabilizer, but A.L.'s father was still opposed to medication so Dr. Anderson did not prescribe a mood stabilizer. (Tr. 394.)

In the spring of 2007, Willmar Public Schools, where A.L. was a student, issued a report for A.L.'s independent education plan ("IEP") evaluating A.L.'s academic achievement and educational needs for the upcoming year.  (Tr. 201–05.)  The examinations occurred in February and the school issued its report in April.  (*Id.*)  Using the Woodcock-Johnson III Tests of Achievement, the school found A.L. required supplemental instruction in the areas of reading and writing outside the classroom.  (Tr. 203–04.)  The report also included observations by A.L.'s classroom teacher, Heather Carruthers.  She noted A.L.'s lack of organization, trouble following several steps of directions, difficulty with responding to questions, and trouble recalling information.  (*Id.*)  Carruthers explained that his math skills were on par with those of his peers, but his reading and writing skills were below grade level.  (Tr. 204.)  The IEP report outlined reading and writing goals for A.L for the upcoming year for which his educators would periodically review his progress.  In June, the school completed a progress report noting adequate progress toward A.L.'s reading and writing goals.  However, notes from a September 2007 progress report indicate A.L.'s skills were regressing when he returned to school after the summer.  (Tr. 201.)  His reading progress regressed slightly, but his educational team did not deem it likely to prevent him from achieving his end goal.  (*Id.*)  His writing skills saw a more significant regression over the summer months and the report expressed concern over this change.  (*Id.*)

Also in the spring of 2007, dated March 5, Willmar Schools conducted its three-year reevaluation of A.L. (Tr. 209–16.) The reevaluation summarized the findings from the IEP plan report and doctors' evaluations. The reevaluation also concluded, based on A.L.'s entire learning record, that he continued to have a learning disorder requiring special education in the areas of reading and writing. (Tr. 215.)

In April 2007, Dr. Anderson provided an update regarding A.L.'s medications. (Tr. 402.) Dr. Anderson had prescribed Methylin and Palmelor. (*Id.*) However, A.L.'s school was concerned about his excessive moodiness, and his mother noticed he was very clumsy while on the medications. (*Id.*) Dr. Anderson decided to discontinue the Palmelor and try only Methylin to see if that improved A.L.'s coordination. (*Id.*)

On September 7, 2007, A.L. had another appointment with Dr. Dorothy Anderson after receiving a call from A.L.'s school reporting that A.L. said he no longer needed to take medication. (Tr. 400.) A.L.'s mother said he was off all medication at this point. (*Id.*) He was moody, overactive, uncooperative, and negative about school. (*Id.*) Dr. Anderson prescribed Methylin for his ADHD and Prozac for irritability and crying spells. (*Id.*) His mother also stated the family was considering moving to Texas. (*Id.*)

A.L.'s school nurse, Olivia, called Nancy Hood, R.N., of Woodland Centers on October 16, 2007, because she was struggling to convince A.L. to take his medications. (Tr. 399.) She believed he was spitting some of his liquid

medication out and wanted to tint it with food coloring to ensure he swallowed it. (*Id.*) The school nurse also reported she was trying to teach A.L. to swallow pills by practicing swallowing candy, but he had trouble swallowing the progressively larger pieces he attempted. (*Id.*) A.L.'s classroom teachers had been asking Olivia whether A.L. was taking his medication because they noticed problems with his "behaviors, focus, and concentration" in class. (*Id.*) Hood followed up by calling A.L.'s mother on October 26, 2007. (Tr. 398.) A.L.'s mother did not provide much more information about the situation except that there were problems with A.L.'s behavior at school and A.L. was not taking Prozac on weekends. (*Id.*) Hood scheduled an appointment for A.L. with Dr. Dorothy Anderson for October 30, 2007, to discuss his prescriptions. (*Id.*)

A.L.'s school's social worker, Cheryl Hansen, MSW, LICSW, completed a report about A.L. in November 2007. (Tr. 176.) She noted A.L. had a number of strengths, including getting along well with his classmates, having a "wonderful sense of humor," and that he did not cause disciplinary problems. (*Id.*) However, she said he could be disruptive and noisy in class and did not like taking his medications, especially when he was away from school. (*Id.*)

According to school records, A.L. and his family moved to Texas in 2008. (Tr. 406–25.) At his school there, Mathis Intermediate School, A.L. received special-education instruction in reading, science, and math. (Tr. 406–25.)

A.L. met with Dr. Anderson at Woodland Centers again on January 29, 2009. (Tr. 440–42.) A.L.'s family had moved to Texas after his last appointment

12

with Dr. Anderson and then moved back to Minnesota at the end of November 2008.  (Tr. 440.)  Dr. Anderson reported A.L.'s problems were "the same as ever," including being overly active and prone to accidents, having mood problems including bursting into tears for no reason, and failing to listen.  (*Id.*) He also had problems sleeping and, in Texas, had insisted on sleeping in his parents' room.  (*Id.*)  Dr. Anderson outlined the numerous medications that A.L. has tried, including liquid methylphenidate, liquid fluoxetine, DayTrana patch, and Strattera, but she noted that determining which work has been particularly difficult as A.L. had problems with some side effects and did not always follow through in taking the medication as prescribed.  (*Id.*)  Dr. Anderson noted A.L.'s symptoms of ADHD and anxiety.  (Tr. 442.)  She prescribed Wellbutrin, which A.L. said he would try to swallow.  (*Id.*)

A.L.'s school completed its yearly reevaluation of his status as a recipient of special education on February 16, 2009 based on various tests, reports, and observation scenarios completed over the previous month.  (Tr. 555–66.)  A.L. did not want to engage in the testing, and he eventually stopped.  (Tr. 556.)  A.L. demonstrated low average skills in math and below average ability in reading and written language skills.  (Tr. 557.)  He struggled in applying academic skills, only participating in assigned work when he received one-on-one instruction or when a reward was offered.  (Tr. 557–58.)  Joel Justin, his case manager, reported A.L. participated in class half of the time.  (Tr. 560.)  Several teachers evaluated his classroom behavior, finding that A.L. had problems following directions and

was often off task.  (Tr. 561.)  He was hyperactive and moved around the room.
(*Id.*)  A.L.'s behavior improved when he had a paraprofessional in the classroom
with him to provide personalized attention.  (*Id.*)  The team of teachers that
contributed to the report concluded that A.L.'s poor educational performance was
due to his ADHD and learning disability.  (Tr. 565.)  The team found that A.L.
needed to improve his reading, writing, and math skills and demonstrate better
respect for his peers and the school staff.  (*Id.*)  The report concluded that A.L.
still needed special education service.  (*Id.*)

Represented by counsel, A.L. and his mother, testified in a hearing before
the ALJ on December 4, 2008.  (Tr. 33–51.)  The ALJ issued his opinion on
February 4, 2009.  (Tr. 14.)

### B.    The Record After the ALJ Released His Opinion

A.L. and his parents attended a follow-up appointment with Dr. Anderson
at Woodland Centers on March 3, 2009, to evaluate his progress while on the
medication Wellbutrin. (Tr. 443.)  A.L.'s teachers reported they still had trouble
with A.L. due to how impulsive and easily distracted he was; he was also now
assigned to the small school bus rather than the regular bus.  (*Id.*)  Dr. Anderson
herself noticed this impulsivity.  (*Id.*)  After several months on the Wellbutrin,
however, his parents did feel as if his mood disorder had improved as he was
less prone to crying.  (*Id.*)  Dr. Anderson decided to continue A.L. on the
Wellbutrin and also add a prescription for Adderall.  (*Id.*)

The annual reevaluation of A.L.'s IEP was filed March 13, 2009. (Tr. 285–86.) It indicated adequate progress toward A.L.'s academic goals. (*Id.*)

Beginning in March 2009, A.L. started a daily behavioral therapy program with Leah Lagergen, M.H.P., at Woodland Centers called Youth Day Treatment. (Tr. 447–99.) The program included group therapy sessions, group skills training, a home behavior notebook in which his parents tracked his progress, and staff meetings with A.L.'s family. (*Id.*) His reported behavior varied from day to day throughout the months he participated. (*Id.*) A.L. stopped attending in July 2009 because A.L.'s parents' work schedules were inflexible and they could not attend any meetings as required by the program. (Tr. 498.)

Dr. Anderson saw A.L. on March 17, 2009, to review progress with A.L.'s medications. (Tr. 448.) With Adderall, A.L. was improving in school. (*Id.*) A.L.'s father was concerned that despite trying Cloniodone and melatonin, A.L. was not sleeping, which was making him tired and irritable during the day. (*Id.*) A.L. was also reluctant to take the medications and said he could control his sleeping problems himself. (*Id.*) However, Dr. Anderson discussed with A.L. how he had not been able to control his various problems in the past and was failing to complete schoolwork and falling behind. (*Id.*) She noted A.L. was opinionated and talkative during the appointment, but required multiple explanations for what was happening. (Tr. 448.) Dr. Anderson opined that A.L. may have a mood disorder based on possible genetic predispositions and symptoms including fluctuating moods and hypomania. (*Id.*) The next day, A.L.'s father came in, still

concerned about A.L.'s trouble sleeping.  (*Id.*)  Dr. Anderson and A.L.'s father decided to try Seroquel to see whether that would help him sleep.  (*Id.*)

A.L. saw Dr. Anderson again on April 16, 2009.  (Tr. 465–66.)  A.L. decided on his own to stop taking Seroquel, which Dr. Anderson had prescribed to help with his sleep problems, because it made him feel "funny."  (Tr. 465.)  He was not sleeping at night, which he blamed on the Wellbutrin.  (*Id.*)  Dr. Anderson also noted A.L. lost several pounds over the month since she last saw him, which she inferred meant he was not eating.  (*Id.*)  In reviewing the Adderall prescription, Dr. Anderson noted A.L. was doing better in school because of it, but it was wearing off by the time he arrived at Woodland Centers for his day treatment program.  (*Id.*)  She decided to increase his Adderall dosage to improve his behavior for the day treatment program and avoid adding another dose altogether.  (Tr. 466.)  She also added Remeron to see whether it would help with A.L.'s sleep, appetite, anxiety, and mood problems.  (*Id.*)

A.L.'s school completed his sixth grade progress report on June 8, 2009. His IEP included social goals toward being on task and respectful and educational goals including math computation, reading fluency, written language, and reading comprehension. The report concluded A.L. was making adequate progress toward each of these goals.  (Tr. 472.)

On November 13, 2009, A.L. and his mother attended an appointment with Dr. Dorothy Anderson.  (Tr. 515.)  A.L. was pleased with having grown.  (*Id.*)  He seemed to be having success with Adderall, as he was calm, had an appetite,

and was able to sleep.  (*Id.*)  A.L. was also willing to take Adderall, which

Dr. Anderson noted was a new development.  (*Id.*)  She decided to continue with

the regimen of Adderall.  (*Id.*)

Dr. Anderson received a report from A.L.'s school social worker, Annette

Tiffany, on February 3, 2010.  (Tr. 518.)  His teachers explained that he did not

seem to be medicated enough, but when the dosage was increased, A.L. was

irritable.  (*Id.*)  He was so hyperactive in school that he spent most of his school

day in the special education room.  (*Id.*)  Dr. Anderson and A.L.'s mother decided

to keep A.L.'s Adderall dosage at 10 mg as it had been and add Intuniv, the

results of which his mother was supposed to report back after the second week.

(*Id.*)

A.L.'s mother called Dr. Anderson on February 26, 2010 to inform her that

Intuniv made A.L. too drowsy, even at a low dosage.  (*Id.*)  They chose to

discontinue the Intuniv.  (*Id.*)

On March 29, 2010, Annette Tiffany, A.L.'s school social worker, referred

him to Woodland Centers' Youth Partial Hospital, a more intense treatment

program than the Youth Day Treatment in which he previously participated.

(Tr. 519–20, 573–77.)  His psychiatrist, Dr. Anderson, submitted a psychiatric

update and summary of A.L.'s stay at the Youth Partial Hospital for the dates

March 29, 2010 to April 16, 2010.  (Tr. 573–77.)  His school made the referral

because he was not functioning well either academically or behaviorally, and its

staff wanted to stabilize his medication.  (Tr. 573.)  The school was also considering transferring A.L. to the Minnewaska Day Treatment School.  (*Id.*)

Dr. Anderson submitted a psychiatric note on April 7, 2010, recording A.L.'s behaviors and progress during his time in the Youth Partial Hospital program.  (Tr. 519–20.)  A.L. had reportedly been off his medications for a week.  (Tr. 519.)  The staff administered a Continuous Performance Test on a computer, during which A.L. displayed hyperactive behavior.  (*Id.*)  However, the test results showed A.L. was "clearly not inattentive or impulsive."  (*Id.*)  Dr. Anderson opined he had a talent for multitasking.  (*Id.*)  He was very talkative and social while there; he was excited to see an older peer, for whom he tried to show off, and he gave good advice to a younger peer.  (*Id.*)  However, he also made a number of sexualized comments.  (*Id.*)  He struggled with understanding what was said to him and seemed to be afraid to show that he did not read well.  (Tr. 519.)  A.L. was in seventh grade at this time, but his tests showed his word recognition to be at a third-grade level.  (*Id.*)  He wanted to stay off medication; Dr. Anderson decided to keep him off medication for the week and said she would reevaluate what would work for him in the following week.  (*Id.*)  She opined that stimulants seemed to manage A.L.'s hyperactivity, but other behavior, including grandiosity and hypersexuality, seemed to indicate a mood disorder for which a mood stabilizer might be more effective.  (*Id.*)

Dr. Anderson made another report on April 9, 2010.  (Tr. 520.)  A.L.'s school social worker had emphasized to Dr. Anderson that he was struggling

18

more at school since he had gone off his medication.  (*Id.*)  Dr. Anderson determined he should start taking Adderall and Intuniv again.  (*Id.*)  He appeared interested in following the rules of the Youth Partial Hospital and recognized appropriate and inappropriate behavior.  Dr. Anderson noted A.L. had serious difficulties with reading and was very self-conscious about it.  (*Id.*)

On April 15, 2010, A.L., his mother, and Dr. Anderson evaluated his progress.  (Tr. 521.)  A.L., his mother, and the Youth Partial Hospital staff all noticed A.L. was more irritable while taking Adderall and Intuniv, so Dr. Anderson chose to discontinue both medications.  (*Id.*)  She instead prescribed Trileptal.  (*Id.*)  The plan at this time was for A.L. to attend Minnewaska Day Treatment School, where Dr. Anderson felt the staff would be able to monitor his medication well and help with his behavioral issues.  (Tr. 521, 541.)

The Minnewaska Day Treatment School created a clinical record for A.L.'s individual treatment plan on May 3, 2010.  (Tr. 570–72.)  The staff recommended an intensive outpatient level of care for A.L.  (Tr. 570.)  Staff members identified A.L.'s primary behavior problem as being "oppositional defiant."  (Tr. 571.)  The treatment plan noted the main goal for A.L. was to show more respect for adults.  (*Id.*)  The staff planned to help A.L. accomplish this goal by teaching him methods to reduce his arguing, lack of following directions, irritability, and emotional outbursts while increasing his willingness to accept responsibility.  (*Id.*)  With a start date in the program of May 3, 2010, Minnewaska hoped to see A.L. achieve his goals by August 3, 2010.  (Tr. 572.)

On behalf of Minnewaska Mental Health Services, a psychologist, Sherie Mahoney, Ph.D., completed a diagnostic assessment for A.L to consider intensive mental-health services in the Minnewaska school program on May 3, 2010. (Tr. 546–54.) Willmar Middle School wanted Minnewaska consider more intensive mental-health services for A.L. because he was experiencing ongoing behavioral difficulties that interfered with his progress in school. (Tr. 546.) The special education coordinator at Willmar Schools reported to Minnewaska that A.L. was irritable, overly sensitive to various stimuli, could not concentrate, was quick-tempered, and could be threatening in school, all of which were negatively impacting his ability to learn. (*Id.*) These behaviors also had a negative impact on A.L.'s relationships with peers and adults at school. (*Id.*) Dr. Mahoney also noted A.L.'s behaviors at home as reported by his mother. These included problems with concentration and distractions as well as bad dreams and anxiety manifested by A.L.'s concerns about being overly orderly and clean. (*Id.*) In an interview, A.L. told Dr. Mahoney that he steals things and does not listen to his teachers when they tell him to do things. (*Id.*) She also gave a summary of A.L.'s family background, noting the family's moves between Willmar and Texas, financial pressures, and A.L.'s irritation with having so much family around the house. (Tr. 546–47.)

Dr. Mahoney made note of A.L.'s general family history of mental-health problems, specifically anxiety, depression, and ADHD. (Tr. 547.) Dr. Mahoney reviewed various tests of A.L.'s behavioral capabilities, all finding that A.L. had

problems with irritability, anxiety, emotional outbursts, inattentiveness and disruptive behavior in class, and making threats to classmates.  (Tr. 548–54.)  Dr. Mahoney assigned A.L. a GAF score of 55.[4]  (Tr. 551.)  At the end of her report, Dr. Mahoney made a number of recommendations for mental-health services for A.L.  (Tr. 552–53.)  She recommended medication management with Dr. Anderson, case management, individual psychotherapy, group psychotherapy, family psychotherapy, individual skills training, group skills training, family skills training, day treatment, PCA (personal care attendant) services, and respite care.  (*Id.*)

Minnewaska Area Day Treatment staff outlined a Behavior Intervention Plan for A.L. in May of 2010 to coincide with a start date for the plan of May 29, 2010.  (Tr. 567–69.)  The plan stated that A.L. needed to behave more appropriately, including complying with the program's rules, following directions, and using courteous language.  (Tr. 567.)  The plan also noted A.L.'s emotional problems and anxiety.  (*Id.*)  The plan laid out several methods of managing A.L.'s behavior at Minnewaska, including a daily point sheet where A.L. could record proper behavior and earn points, calming time to occur when A.L. became emotional or irritated, and daily mental-health services.  (Tr. 568.)

A.L. had an appointment with Dr. Anderson on July 20, 2010, to evaluate the effectiveness of his medication.  (Tr. 579.)  She noted that A.L. had been

---

[4]     A GAF score of 55 indicates a child has moderate symptoms or functional difficulties. *See* American Psychiatric Association, *supra* note 2, at 34.

doing well at school at Minnewaska and was "joking around" quite a bit, both at school and during their appointment. (*Id.*) His mother was not sure if the prescribed Trileptal was working, and Dr. Anderson decided to increase the dosage to see whether it was effective. (*Id.*)

On August 27, 2010, A.L. again met with Dr. Anderson. (Tr. 580.) Over the summer, A.L.'s family suffered a tragedy and spent time in Texas, so A.L. had not been taking his Trileptal regularly and also did not attend Minnewaska over the summer. (*Id.*) He was to return to Minnewaska for the fall, however. (*Id.*) Dr. Anderson noted A.L. was on edge and pestered his mother as the appointment went on, but was pleasant and respectful. (*Id.*) She decided to again increase A.L.'s Trileptal dosage and opined she might later prescribe something for his symptoms of ADHD. (*Id.*)

A.L.'s next appointment with Dr. Anderson occurred on October 13, 2010. (Tr. 581–82.) At this time, A.L. was in school at Minnewaska, and his medication was reportedly not helping with his behavior problems in school. (Tr. 581.) A.L. decided to stop taking his nightly dose of Trileptal and did not like it because it made him dizzy and irritable. (Tr. 580–82.) Dr. Anderson noted that A.L. made jokes throughout the appointment and said he enjoyed provoking others and did not want to follow directions. (Tr. 582.) Dr. Anderson discontinued the prescription for Trileptal and prescribed Vyvanse instead; Vyvanse was not covered by the family's insurance, however. (*Id.*)

### III. Testimony at the Administrative Hearing

A.L. and his mother, represented by counsel, testified before the ALJ on December 4, 2008.  (Tr. 33–51.)

A.L. testified that he liked school "a little bit" and had "a lot" of friends there, naming several.  (Tr. 37.)  His favorite class was "P.E.," and he said the only thing he did not like in school was "a little bit of math."  (Tr. 39.)  A.L. said he liked to read "a little bit" and that Pokémon was his favorite thing to read.  (*Id.*)  He said he sometimes went over to his friend Daniel's house to play outside in a tire swing at the park.  (Tr. 38.)  When discussing his home life, A.L. said his mom asked him to do things like "take out the trash, sit down, and listen," but he did not like to take out the trash because he did not "want to get dirty."  (Tr. 40.)

Plaintiff, A.L.'s mother, also testified. She explained that a teacher from school suggested filing this claim for her son.  (Tr. 41.)  She said over the last four years, she "had a lot of teachers call [her] because he's done a lot of things." (Tr. 42.)  She said he would leave the classroom to go outside, and once, on a bus for a field trip, he had a match and the bus had to pull over, so she had to be there for A.L. to attend future field trips.  (Tr. 42–43.)  In discussing their time living in Texas, Plaintiff testified that she had some meetings with school officials about A.L because he would leave classrooms.  (Tr. 47.)

In the area of A.L.'s academics, his mother testified that a teachers' aide would give A.L. extra help in the classroom.  (Tr. 47.)  She also testified about his reading ability, saying he "kind of stutters when he reads" and did not read at the

23

level she believed he should, especially since her seven-year-old child reads "a little better" than A.L. (Tr. 48.) Plaintiff said A.L. could sometimes do arithmetic and make change for money. (*Id.*) She explained that at one point, the school was going to hold A.L. back a grade level, but she talked the principal into promoting him into the next grade if he participated in summer school since she wanted him to stay with his friends his own age. (Tr. 49.)

Plaintiff also discussed A.L.'s history of medication, testifying that she did not believe the medicine helped. (Tr. 44.) She hoped it would "slow him down a little" and also help with how often he would start suddenly crying, but she did not see improvement in those areas. (*Id.*) She also explained his treatment history at Woodland Centers Youth Day Treatment program after school, opining that she did not believe it helped because she was not seeing any progress. (Tr. 45.)

Socially, Plaintiff said she has met a few of A.L.'s friends, two of whom are actually his cousins. (*Id.*) She said he will go to his cousin Daniel's house but after an hour or so, A.L. calls her, and sometimes she has to be there for him to stay. (*Id.*) She testified A.L. had trouble being away from her, and once, when she went to the store, he went looking for her because he thought she was not coming back. (Tr. 47.)

Plaintiff testified that at home A.L. was supposed to keep his room clean and take the trash outside. (Tr. 45–46.) She said A.L. was not good at doing his chores and did not want to take the trash out. (Tr. 46.) In comparing A.L. to his siblings, Plaintiff said there was a "big difference" between them. (Tr. 49.) She

said the other children always did as she asked and generally did better in school as well.  (*Id.*)

## IV.   The ALJ's Findings and Decision

In his February 4, 2009 decision, the ALJ determined that A.L. was not disabled according to section 1614(a)(3)(C) of the Social Security Act and denied Plaintiff's application for supplemental security income on behalf of A.L.  (Tr. 30.) In making this determination, the ALJ applied the Social Security Administration's three-step evaluation process for deciding whether a child is disabled.  *See* 20 C.F.R. § 416.924(a).  A child is defined as "an individual who is neither married nor . . . the head of a household, and who is (1) under the age of eighteen, or (2) under the age of twenty-two and . . . a student regularly attending a school . . . ." 42 U.S.C. § 1382c(4)(C)(c).

At the first step of the three-step evaluation process, the ALJ must consider whether the minor child is engaged in "substantial gainful activity," defined as "significant physical or mental activities" done "for pay or profit." 20 C.F.R. § 416.972.  If the child is not engaged in substantial gainful activity, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the minor child has either a medically determinable "severe" impairment or a combination of impairments that are "severe."  *See* 20 C.F.R. § 416.924(c).  If the impairment is not "medically determinable" or "is a slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations," the Social Security

25

Administration will not find disability. *Id.* If the minor child's impairment is severe, the ALJ's analysis will continue to the third step.

Finally, the third step of analysis requires that the child's impairment either (1) meet, (2) medically equal, or (3) functionally equal the listings in 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). Here, the ALJ must consider not only the severe impairments, but the combined effect of all medically determinable impairments. *See* 20 C.F.R. §§ 416.923, 416.924a(b)(4). If the impairment does meet, medically equal, or functionally equal the listings, the child is deemed disabled. 20 C.F.R. § 416.924(d)(1).

If a child's impairment meets one of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1, he will be found to be disabled. Listing 112.11 of 20 C.F.R. § 404, Subpart P, Appendix 1, refers to attention deficit hyperactivity disorder. The listing requires that the applicant demonstrate "developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. § 404, subpt. P, app. 1, listing 112.11. The disorder is at the required level of severity if it meets two criteria: (1) medically documented findings of "marked inattention," "marked impulsiveness," and "marked hyperactivity", and (2) for children ages 3–18, "at least two of the appropriate age group criteria in paragraph B2 of 112.02." *Id.* These "appropriate age-group criteria" include "marked impairment in age-appropriate cognitive/communicative function," "marked impairment in age-appropriate social functioning," "marked impairment in age-appropriate personal functioning," or "marked difficulties in maintaining

concentration, persistence, or pace." 20 C.F.R. § 404, subpt. P, app. 1, listing 112.02(B)(2). These criteria should be "documented by history and medical findings," and the ALJ may also consider "information from parents or other individuals who have knowledge of the child, when such information is needed and available." *Id.* The ALJ may also consider "appropriate standardized tests" in making this determination. *Id.*

If the child's impairment does not meet a listing, it may "medically equal" the listing in 20 C.F.R. § 404, Subpart P, Appendix 1, in one of three ways. First, if the impairment is described in the listings, but the applicant does not exhibit one or more of the findings required, or a finding is less severe than is required, the ALJ will find the impairment to be "medically equivalent" to a listing if the impairment is at least equally medically significant. 20 C.F.R. § 416.926(b)(1)(i)–(ii). Second, if the impairment is not described in the listings, but the record shows that the impairment is "closely analogous" to a listing and is at least as medically significant, then it will medically equal the listing. 20 C.F.R. § 416.926(b)(2). Finally, if a combination of impairments is not described in the listings, but the record shows that the impairment is "closely analogous" to a listing and is at least as medically significant, then it will medically equal the listing. 20 C.F.R. § 416.926(b)(3).

If the child's impairment fails to meet or medically equal the listings under step three of the analysis, it may "functionally equal" the listings. 20 C.F.R. § 416.926(a). To do so, the ALJ must consider first whether there is an

underlying medically determinable physical or mental impairment which could reasonably be expected to cause the child's symptoms.  20 C.F.R. § 416.929(b). Once the ALJ identifies an underlying physical or mental impairment that could cause the child's symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of the child's symptoms.  20 C.F.R. § 416.929(c).  If there is no objective medical evidence to support a stated symptom, the ALJ will consider other evidence, evaluating the statement's credibility by considering the entire record.  *See* 20 C.F.R. § 416.929(c)(3).

To "functionally equal" the listings, the ALJ considers the child's symptoms and functioning in six domains: (1) "acquiring and using information," (2) "attending and completing tasks," (3) "interacting and relating with others," (4) "moving about and manipulating objects," (5) "caring for yourself," and (6) "health and physical well-being."  20 C.F.R. § 416.926a(b)(1)(i)–(vi) .

In the domain of "acquiring and using information" for "school-age children," the ALJ will consider the child's ability to learn academic skills in reading, writing, math, history, and science and his ability to use them in academic settings.  20 C.F.R. § 416.926a(g)(2)(iv).  The child should be able to demonstrate his skills in home and community settings as well.  *Id.*

The domain of "attending and completing tasks" considers the child's ability to "focus" and "maintain attention," as well as his ability to "begin, carry through, and finish [his] activities."  20 C.F.R. § 416.926a(h).  School-aged children "should be able to focus [their] attention in a variety of situations,"

"concentrate on details and not make careless mistakes," "change activities and routines without distracting [themselves] or others," and "stay on task and in place." 20 C.F.R. § 416.926a(h)(2)(iv).

"Interacting and relating with others" means the child can "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i).

The domain of "moving about and manipulating objects" relates to a child's "gross and fine motor skills," including the ability to move one's body from place to place and the ability to move and manipulate things. 20 C.F.R. § 416.926a(j).

Within the domain of "caring for yourself," the ALJ considers the child's ability to "maintain a healthy emotional and physical state," which may include "get[ting] . . . physical and emotional wants and needs met in appropriate ways," "cop[ing] with stress and changes in [the child's] environment; and whether [the child] takes care of [his] own health, possessions, and living area." 20 C.F.R. § 416.926a(k).

Finally, the domain "health and physical well-being" accounts for "cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the child's] functioning." 20 C.F.R. § 416.926a(l). This includes not only physical or mental disorders, but also the side effects of medications. 20 C.F.R. § 416.926a(l)(2).

Within the meaning of 20 C.F.R. § 416.926a, an impairment functionally equals the listings if it "result[s] in 'marked' limitations" in two of the above domains of functioning or "an 'extreme' limitation in one domain." A "marked limitation" is defined as an impairment that "interferes seriously" with the child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is "more than moderate" but "less than extreme." *Id.* In testing terms, the child would be expected to score at least two, but less than three, standard deviations below the mean in his functioning within the domain. *Id.* An "extreme limitation" means the "impairment(s) interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). The limitation must be "more than marked." If tested for functioning within the domain, the child would be expected to score at least three standard deviations below the mean. *Id.*

The ALJ noted that A.L. was born January 24, 1997, making him a child from the date of the application's filing until the time the ALJ issued his opinion. (Tr. 20.)

The ALJ concluded, at the first step of analysis, that A.L. had not participated in "substantial gainful activity" during any period relevant to the ALJ's decision and moved on to the next step. (*Id.*)

At the second step of analysis, the ALJ determined that A.L. exhibited several severe impairments, including "attention deficit hyperactivity disorder, oppositional defiant disorder, probable mood disorder, and a learning disorder."

(*Id.*)  These impairments bring A.L. within the definition of 20 C.F.R. § 416.924(c).  In making this conclusion, the ALJ considered A.L.'s record as explained by a number of sources.  (*Id.*)  First, the ALJ considered the examination by Dr. Steven Thurber, which supported diagnoses of ADHD, oppositional defiant disorder, and possible depression, and also made note of A.L.'s school-related difficulties.  (*Id.*)  The ALJ also acknowledged the efforts of Dr. Dorothy Anderson toward finding an effective medication for A.L., but that she had difficulty determining what worked because of infrequent contact with A.L. (*Id.*)  However, the ALJ noted Dr. Anderson did try a wide variety of prescriptions with A.L. following their first meeting in January 2005.  (Tr. 20.)  The ALJ also considered A.L.'s participation in the Youth Day Treatment at Woodland Centers in 2006, but again noted that infrequent contact with A.L. during his time in Youth Day Treatment made it difficult for Dr. Anderson to gauge the success of the various medications attempted and that A.L.'s father was "opposed to medicative therapy."  (*Id.*)  The ALJ further considered the consultative evaluation performed by Dr. Patrick Carroll on August 2, 2006, which found that A.L. "seemed to have learning problems as well as a history of attention deficit hyperactivity disorder" managed by medication.  (*Id.*)  The ALJ also noted that Dr. Carroll opined that A.L.'s ability to pay attention "improved with the use of medications."  (*Id.*)

Having concluded that A.L. had a severe impairment, the ALJ moved to step three to consider whether A.L.'s impairment met, medically equaled, or functionally equaled the listings.

First, the ALJ concluded that, giving "substantial weight to the assessments of state agency consultants," A.L.'s impairment or combination of impairments failed to either "meet" or "medically" equal one of the listings. (Tr. 21.)

Next, the ALJ concluded that, based on the record as a whole, A.L.'s symptoms also failed to "functionally equal" the listings. (Tr. 22.) Regarding the "intensity, persistence, and limiting effects" of A.L.'s symptoms, the ALJ found that statements in the record that A.L.'s symptoms significantly limited his functioning lacked credibility because they were "inconsistent with finding that the child does not have an impairment or combination of impairments that functionally equals the listings." (*Id.*)

To explain the conclusion that A.L.'s symptoms did not functionally equal the listings, the ALJ considered the record in light of the six domains from 20 C.F.R. § 416.926a.

The ALJ concluded A.L. had "less than marked limitation in acquiring and using information." (Tr. 23.) In making this determination, the ALJ considered information from state reviewing doctors and treating physicians, A.L.'s school records, and testimony at the administrative hearing. He noted reports from Dr. Thurber and Dr. Carroll. Dr. Thurber indicated that A.L. tested within average intellectual capability in prior testing. (*Id.*) He also noted Dr. Carroll's testing of A.L. which resulted in an IQ of 71, which was not low enough to warrant concern. (*Id.*) School records showed that A.L.'s reading skills were below those of his

classmates, but he could stay in class to learn other subjects.  (*Id.*)  Records also showed that A.L. was making progress in his reading and writing skills, although he still required special-education instruction.  (*Id.*)  The ALJ also noted A.L.'s teacher's report showing A.L. performed below grade level and had "a lot of trouble" in reading, requiring special instruction, but that he performed at grade level in math.  (*Id.*)  School records also reflected that A.L. was "much more productive" during the times he was taking his prescribed medication.  (Tr. 23.) The ALJ also considered statements from A.L.'s mother. He noted that she mentioned A.L.'s speech and language delays in a disability report.  (*Id.*)  He also noted that she testified at the administrative hearing that A.L. did well academically but stuttered while reading and was nearly held back a grade level. (*Id.*)  The ALJ also acknowledged A.L.'s own statement at the administrative hearing that A.L. knew he was in school and that he "liked school 'a little bit.'" (*Id.*)

Considering A.L.'s functioning in the domain of "attending and completing tasks," the ALJ determined that A.L. demonstrated less than marked limitation. The ALJ considered school records, statements by A.L.'s mother, and examinations by state reviewing doctors. The ALJ considered that school records back to 2005 showed A.L.'s "short attention span" prevented him from working through tasks without adult assistance.  (Tr. 24.)  The ALJ also noted that this made A.L. disruptive in the classroom, which was corroborated by statements from A.L.'s classroom teacher.  (*Id.*)  The ALJ also looked at statements from

33

A.L.'s mother, who explained the difficulty A.L. had in getting his homework done, finishing his chores, and staying busy without guidance from an adult. (Tr. 23.) He also made note of A.L.'s own statements that he liked his physical education classes and enjoyed reading Pokémon. (Tr. 25.) Finally, the ALJ considered the report from Dr. Carroll, which noted that during testing, A.L.'s problems seemed to stem more from "a lack of verbal skills" than any issues with "focus, concentration, or attention." (Tr. 23.) The ALJ observed that during Dr. Carroll's testing, A.L. did not leave his chair and did not appear "fidgety." (Tr. 24.) The ALJ also made note of Dr. Carroll's observation that A.L. put forth good effort toward a number of tasks, enjoyed success, and had no trouble understanding Dr. Carroll's directions. (Tr. 25.) The ALJ further commented that Dr. Carroll made note that A.L. was better able to pay attention when he was using medications and when he was interested in a task. (*Id.*)

The third domain is "interacting and relating with others," within which the ALJ concluded A.L. exhibited less than marked limitation. The ALJ considered reports from school, A.L.'s mother's statements, and statements from A.L. in reaching this conclusion. School reports indicated that because A.L. was impulsive, his behavior could at times be inappropriate and would interfere with A.L.'s ability to keep friends. (*Id.*) However, when rewarded for exhibiting good behavior on the bus, A.L. quickly complied and improved his behavior, earning a reward almost immediately. (Tr. 25–26.) The ALJ did note that A.L.'s teacher commented on his tendency to seek attention and ask permission inappropriately

and his trouble in interpreting communication from others, including "facial expression, body language, hints, and sarcasm."  (Tr. 26.)  The ALJ accounted for the reports from A.L.'s school social worker that A.L. had a good sense of humor and got along with his peers, although he would "test relationships" after establishing them.  (*Id.*)  The ALJ also noted A.L.'s mother's concern that A.L. had trouble making new friends and that he got in trouble in class for leaving and once for pulling the emergency latch on the school bus.  (*Id.*)  Finally, the ALJ considered his own observations of A.L. and A.L.'s statements in the hearing. The ALJ commented that A.L. was quick to make jokes with him at the hearing and "adequately answered" the questions asked of him.  (*Id.*)  The ALJ also commented that A.L. testified that he had friends, named several of them, and said that he went to play at his friend Daniel's house.  (*Id.*)

Next, the ALJ evaluated A.L.'s functioning in the domain "moving about and manipulating objects."  The ALJ found no limitation in A.L.'s fine and gross motor skills, as corroborated by statements from A.L.'s mother, teacher, and evaluating doctor.  (Tr. 27.)  A.L. testified before the ALJ that he liked to play outside, swing in the park, and play Pokémon.  (*Id.*)

The ALJ then appraised how well A.L. functioned in the domain "caring for yourself."  The ALJ concluded A.L. had less than marked limitation.  (Tr. 28.) A.L.'s teacher and state reviewing doctor both stated A.L. did not demonstrate problems in this area.  (*Id.*)  The ALJ noted Dr. Carroll specifically observed that A.L. seemed "fairly independent" and could perform age-appropriate tasks like

dressing himself, getting snacks, and taking care of some hygiene matters. (*Id.*) His mother, according to the ALJ, viewed A.L.'s abilities differently from the doctors and stated A.L. often did not do what he was told, failed to "obey safety rules," and did not take criticism well. (*Id.*) While testifying before the ALJ, A.L. said he did not like to take out the trash because he did not want to get dirty, but he did sometimes clean a room in their home. (*Id.*)

Finally, the ALJ considered A.L.'s status in the domain of "health and physical well-being." The ALJ concluded A.L.'s limitation was less than marked, paying particular attention to the role of medication in A.L.'s record. (Tr. 29.) In making his decision, the ALJ referred to medical records, school records, and testimony in the administrative hearing. The ALJ stated he gave greater weight to A.L.'s school records than statements from A.L. or his family because the school records offered a more objective view. (*Id.*) The ALJ noted that medical records over the years indicated the difficulty A.L.'s doctor had in establishing a plan for medications because she had infrequent contact with A.L., the medication was "irregularly" administered at A.L.'s home, and A.L.'s father did not support medication. (*Id.*) The ALJ commented that school records indicated A.L.'s functioning "unequivocally" improved when he was taking medication. (*Id.*) This conclusion was supported by statements from A.L.'s classroom teacher, who noted A.L. was "much more productive" if he took medication. (*Id.*) The ALJ also made note of comments from A.L.'s school social worker finding that A.L. did not like taking his medication because he said it "made him 'too calm'" and

the nurse suspected A.L. was spitting liquid medication out. (*Id.*) The ALJ also included comments that Plaintiff requested A.L.'s medication be sent home so he could take it there as well, but A.L. told the social worker that he did not take his medication at home. (Tr. 29.) The ALJ discounted statements by A.L.'s mother that the prescribed medication did not improve A.L.'s functioning on the basis of the school and medical records. (*Id.*)

Because the ALJ concluded A.L. did not have an impairment or combination of impairments that resulted in "marked" limitations in two of the relevant domains or "extreme" limitation in one domain, the ALJ concluded A.L. was not disabled pursuant to 20 C.F.R. § 416.924(a). (*Id.*)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(3)(C)(i) (2004).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.

42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id*.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Id*. (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *See Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  The possibility that the Court could

draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

## II.     Analysis of the ALJ's Decision

Plaintiff raises two issues in support of her motion for summary judgment in contending the ALJ failed to consider the record as a whole. (Doc. No. 20.) She argues that, first, the record shows that A.L.'s impairments medically equaled listing 112.11, indicative of severe symptoms related to ADHD. *See* 20 C.F.R. § 404, subpt. P, app. 1, listing 112.02(B)(2). Second, Plaintiff claims A.L.'s impairments functionally equaled a listing of impairment. (*Id.* at 20.) She argues the ALJ afforded too much weight to A.L.'s alleged improvement on medication, which she refutes, and discounted Plaintiff's testimony, school records, and continuing treatment by mental-health providers. (*Id.* at 21.) Plaintiff cites to parts of the record submitted after the ALJ issued his decision on February 4, 2009.

In response, Defendant argues that the record as a whole supports the ALJ's findings. (Doc. No. 26.) First, Defendant argues the record shows medication improved A.L.'s symptoms. (*Id.* at 10.) Defendant next argues that the medical records show that A.L. did not have an impairment that resulted in disability. (*Id.* at 10–13.) The medical records, Defendant argues, show that doctors did not believe A.L.'s symptoms were severe and that a number of doctors noted that medication helped and that A.L.'s parents did not adequately

follow up with A.L.'s treatment.  (*Id.* at 11.)  Defendant also argues that A.L.'s school records support the findings of the ALJ.  (*Id.* at 13–14.)  The ALJ, Defendant argues, properly accounted for reports from teachers and social workers finding that while A.L. had some limitations, his symptoms did not rise to the level of a disability.  (Doc. No. 26 at 14.)  Defendant additionally contends that the ALJ acted within his authority by discounting the statements of A.L.'s mother and other family members as they were inconsistent with the rest of the record.  (*Id.* at 14–15.)  Finally, Defendant argues that the parts of the record submitted after the decision are irrelevant, and, even if the ALJ had considered them, these post-decision submissions would not have changed the decision.  (*Id.* at 15–18.)

### A. Whether the ALJ and Appeals Council Failed to Evaluate the Medical Evidence of Record Properly and Failed to Consider All Medical Evidence Determining Disability.

Plaintiff argues that the ALJ failed to properly consider all of the medical evidence of record properly.  Plaintiff contends that, had the ALJ properly reviewed the medical evidence, he would have found that A.L.'s impairment medically equaled listing 112.11, which relates to symptoms of ADHD (20 C.F.R. § 404, subpt. P, app. 1, listing 112.11), or functionally equaled an impairment based on "medically documented findings of marked inattention, marked impulsiveness, and marked inactivity, continuing at a disabling level despite medication."  (Doc. No. 19.)  This argument has three components: (1) whether the ALJ and Appeals Council should have considered the parts of the record

submitted after the ALJ issued his decision, (2) whether the ALJ erred in giving too much weight to A.L.'s improved condition on medication, and (3) whether the ALJ properly considered the record as a whole.

### 1. Whether the ALJ and Appeals Council Should Have Considered The Record Submitted After the ALJ's Decision.

In her brief, Plaintiff references material submitted after the ALJ issued his decision on February 4, 2009. However,

> [i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision*. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. § 404.970(b) (emphasis added).

Any evidence submitted that "show[s] a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand." *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997). For new evidence to be considered, it must be "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied." *Id.* (citing *Woolf v. Shalala,* 3 F.3d 1210, 1215 (8th Cir.1993)). The claimant may, of course, use that later information in a new application for benefits, as the Appeals Council indicated to Plaintiff. (Tr. 2.); *see also* 20 C.F.R. § 404.970(b).

The parts of the record submitted after the ALJ's decision relate to a later time period than the period of application prior to the issuance of the decision. The record for the time after the decision is not probative of A.L.'s condition prior to the decision. Therefore, neither the ALJ nor the Appeals Council need to have considered any events or reports made after the ALJ issued his decision on February 4, 2009. This includes several medical records (Tr. 443, 448, 465–66, 515, 518, 580–82), A.L.'s time spent in Youth Day Treatment at Woodland Centers (Tr. 447–99 ), A.L.'s stay at Woodland Centers' Youth Partial Hospital (Tr. 519–20, 573–77), and records from Minnewaska Day Treatment School (Tr. 570–72, 546–54, 567–69).

### 2. Whether the ALJ Erred by Considering the Improvement of A.L.'s Condition While Taking Medication.

The Plaintiff contends that the ALJ erred in affording too much weight to A.L.'s improvement on medication, arguing the improvement was "temporary and episodic" at best. (Doc. No. 20 at 21.)

As an initial matter, in considering whether a claimant's impairments meet, medically equal, or functionally equal the listing for ADHD, numerous courts have taken into account the positive impact that medication has on the claimant's limitations. *See Richardson v. Barnhart*, 136 Fed. App'x 463, 467 (3d Cir. 2005) (concluding that substantial evidence supported the ALJ's conclusion that claimant's did not meet or medically the listing for ADHD, in part, because claimant was able to focus and complete tasks when he took medication as

prescribed); *Tate ex rel. Tate v. Comm'r of Soc. Sec.*, 368 F. Supp. 2d 661, 665, 672 (E.D. Mich. 2005) (noting that the claimant's use of Ritalin had a positive impact on the claimant's behavior); *Brown v. Comm'r of Soc. Sec.*, 430 F. Supp. 2d 102 (W.D.N.Y. 2005) (concluding that ALJ's decision was supported by substantial evidence where ALJ relied on physician's note that despite claimant's ADHD he was doing well on medication); *Davenport v. Apfel*, 151 F. Supp. 2d 1270, 1276–77 (D. Kan. 2001) (concluding that substantial evidence supported the ALJ's that the claimant did not meet or medically equal the ADHD listing, in part, because medication helped control the claimant's ADHD).

Further, when impairments are "controllable or amenable to treatment," they fail to support findings of disability. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999). In *Johnson*, the plaintiff struggled with his speech, but the record before the court demonstrated that he saw improvement in his communication when he took his medication and participated in speech therapy. *Johnson*, 240 F.3d at 1147–48. "[I]f the treatment can reduce [the child's] functional limitations so that they are no longer marked and severe," the child must follow the treatment to receive benefits. 20 C.F.R. § 416.930(a).

The ALJ concluded that when A.L. took his prescribed medications, his symptoms were under control. (Tr. 20–21, 23, 25, 29.) The ALJ cited to the record to support this finding, noting that he gave more weight to the statements of school and medical personnel than to the statements by A.L.'s family as he

found the latter to be more objective.  (Tr. 29.)  The ALJ is entitled to make this

credibility judgment when, as here, there are inconsistencies in the record where

A.L.'s parents evaluated the medication's success differently from other third

parties.  For example, Dr. Anderson's notes from March 2006 indicate A.L.'s

school staff felt he did "much better" in school when he was taking his

medication.  (Tr. 322.)  His teacher, Heather Carruthers, also indicated in her

report that medication "really helped" A.L.  (Tr. 148.)  The ALJ noted that

throughout the record, Dr. Anderson commented that A.L.'s parents were

inconsistent in their administration of A.L.'s prescribed medications, but that his

symptoms, as viewed by those who were not his parents, improved when he took

medication.  (Tr. 20–29.)  Cheryl Hanson, the school social worker, commented

that A.L. disliked taking his medication, often failing to do so at home and on

weekends.  Therefore, this Court finds that the ALJ's consideration of A.L.'s

improved condition while taking medication was appropriate and supported by

substantial evidence on the record as a whole.

### 3.    Whether the ALJ Failed to Consider the Record As a Whole.

Plaintiff makes a general argument that the ALJ failed to consider the

record as a whole.  She argues that proper consideration of this evidence should

have resulted in a finding of disability either as medically meeting listing 112.11,

(20 C.F.R. § 404, subpt. P, app. 1, listing 112.11), or functionally meeting an

impairment based on "medically documented findings of marked inattention,

marked impulsiveness, and marked inactivity, continuing at a disabling level despite medication." (Doc. No. 20 at 20.) She relies on evidence from medical providers and records, school records, and third-party statements to support this assertion. (*Id.*)

Plaintiff spends a page of her brief discussing the weight to be afforded to a treating physician's and a specialist's opinions, noting two exceptions which she comments are inapplicable to this case. (*Id.* at 17.) Plaintiff further comments that the ALJ has a duty to fully develop the record, especially in *pro se* cases; this is not a *pro se* case. She discusses *Roelandt ex rel. Roelandt v. Apfel*, a case in which the court considered a denial of benefits to a child diagnosed with ADHD and fetal alcohol syndrome. 125 F. Supp. 2d 1138 (S.D. Iowa 2001). In that case, the record showed severe impairment corroborated by all sources and, finding substantial evidence did not support the denial of benefits, the court reversed the decision. *Id.* Plaintiff also comments that an ALJ may reject a parent's testimony where there are inconsistencies in the record and no showing of marked or severe functional limitations or where there is a lack of evidence of ongoing medical treatment inconsistent with the parent's testimony. (Doc. No. 20 at 20.) To support this contention, Plaintiff cites 42 U.S.C. § 1382(a)(3)(A), which deals with eligibility for benefits, and includes no discussion of the weight of parental statements, and two cases, one of which does not discuss the credibility of parental statements at all. *See Bolton v. Bowen*, 814 F.2d 536 (8th Cir. 1987). Despite these numerous statements of

law, many irrelevant, Plaintiff fails to clarify how any apply to her arguments before this Court. Plaintiff argues, by mentioning various parts of the record, that the record shows A.L. both medically and functionally meets the listings for supplemental security income. However, much of Plaintiff's discussion includes parts of the record submitted after the ALJ issued his decision (discussed above). To support her argument that the record shows A.L. has a disability, Plaintiff includes snippets of notes from Dr. Anderson's medical records indicating A.L.'s hyperactivity, frequent medication trials, and behavior problems. (Doc. No. 20 at 4–5.) Plaintiff notes family statements, including those from A.L.'s mother and three aunts, who stated he was hyperactive, and his mother's belief that medication did not work. (*Id.* at 20.) Plaintiff also mentions A.L.'s Willmar Schools' IEP, which indicated difficulty in school and a learning disability that required special education. (*Id.* at 21.) This Court addresses each type of record (medical, school, and third party) below and considers the ALJ's review of the record as a whole.

An ALJ may afford substantial weight to the opinion of a state medical consultant "along with the medical evidence as a whole." *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007). Opinions by treating physicians, in contrast, are given "controlling weight" if "well supported by . . . medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005)). However, a " treating

physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Goff*, 421 F.3d at 790 (quoting *Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir.1995) (alterations in original)).

The ALJ granted substantial weight to the opinions of the state agency consultants in concluding that A.L. did not meet or medically equal one of the listings for impairment in accordance with *Casey*. Drs. Carroll and Getman performed these evaluations, neither finding that A.L. was disabled. The ALJ also made note of Dr. Carroll's comment on A.L.'s improved condition when he took his medication. (Tr. 20.) The ALJ included many of A.L.'s treating doctor, Dr. Anderson's, notes and records. (Tr. 20–29.) However, nowhere in the record does Dr. Anderson opine about A.L.'s level of disability; these opinions (stating he was not disabled) come from the state agency consultants. While Plaintiff takes issue with the ALJ's assertion that A.L.'s condition improved with medication (discussed above), Plaintiff fails to point out any treating doctor's opinion that should have been granted more weight. Plaintiff also apparently does not take issue with the overall opinions of any of the state agency consultants, despite including statements of law about the weight to be granted to the opinions of treating doctors. The ALJ includes the opinions and copious notes from Drs. Thurber, Anderson, and Carroll throughout his review of the record. He notes their concerns about A.L.'s hyperactivity and behavioral problems and acknowledges that these are severe impairments. (Tr. 20.) The ALJ then concludes, based on the medical opinions of the state agency

consultants, that the impairments did not medically meet the listings and then considers in great depth whether A.L. functionally met the listings in the six domains. (Tr. 21–29.) The ALJ concluded that although A.L. had severe impairments, the medical records indicate A.L. did not meet, medically equal, or functionally equal the listings. (*Id.*) As a whole, the medical records support the ALJ's finding.

The ALJ also included A.L.'s school records in his decision, which Plaintiff contends show continuous disability throughout the application period. (Tr. 20–29.) The ALJ relied heavily on the statements of Heather Carruthers, a teacher who gave the opinion that A.L.'s limitations were less than "very serious" or "serious" in practically every domain. The ALJ also makes note of the school social worker, Cheryl Hanson's, opinions about A.L., which conclude that he had "many strengths" and disliked taking his medication, often failing to do so at home and on weekends. (Tr. 26, 29.) While A.L.'s school records indicated he had difficulty in school and diagnoses related to his school functioning throughout the application period, the ALJ's decision that the school records do not support a finding of disability is supported by substantial evidence on the record as a whole.

Finally, Plaintiff argues the statements by A.L.'s family members support a showing of disability. The ALJ, however, specifically noted that he gave greater weight to the school records as he found them to be more objective. (Tr. 29.) The ALJ chose to reject the statements of these relatives as he found them to be

inconsistent with the record as a whole (namely, the medical and school records

discussed above) and chose to rely on more objective opinions.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 19), be **DENIED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 25), be

       **GRANTED**; and

3.    This case be **DISMISSED**.


Date: January 8, 2013

                                        _s/ Jeffrey J. Keyes_____
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 22, 2013**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo determination of those portions to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable to the Court of Appeals.